SO ORDERED: September 15, 2011.




Anthony J. Metz III
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| IN RE ) | |
| ) | |
| JEFFERY ALLEN DOUGHTY ) | |
| ) | |
| Debtor ) | |
| ) | Case No. 10-14671-AJM-7 |
| _____ ) | |
| ) | |
| MUTUALBANK, ) | |
| ) | |
| Plaintiff ` ) | |
| Vs. ) | Adversary Proceeding |
| ) | No. 11-50075 |
| ) | |
| JEFFERY ALLEN DOUGHTY ) | |
| ) | |
| Defendant ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

MutualBank, the Plaintiff ("Mutual") , filed its complaint against the debtor and defendant, Jeffery Doughty (the "Debtor"), to determine dischargeability of debt under Sections 523(a)(4) and (a)(6) of the Bankruptcy Code on March 22, 2011. Trial was held

on August 31, 2011 wherein Mutual appeared by its counsel, J. Philip Updike. The Debtor did not appear in person or by counsel. At the conclusion of the trial, the Court found that the debt owed to Mutual by the Debtor was nondischargeable under both §523(a)(2)(B) and (a)(6). The Court now makes its written findings and conclusions, in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### *Findings of Fact*

1.  On or about September 12, 2008, Mutual loaned $32,000 to the Debtor (the "First Loan"). Payment of the loan was First Loan was secured by all of the Debtor's inventory, chattel paper, accounts, equipment, instruments, deposit accounts, documents, general intangibles, and a 2002 Bobcat Excavator Model #442 Serial #522311051 (the "Collateral"), as well as any after-acquired property related to the Collateral. Mutual perfected its security interest in the Collateral by filing its UCC financing statement with the Indiana Secretary of State on September 19, 2008.

2.  On or about December 19, 2008, Mutual loaned $241,000 to the Debtor (the "Second Loan"). Payment of the Second Loan was secured not only by the Collateral pledged in relation to the First Loan, but also by a 2002 Bobcat Excavator Model #337. The security agreement related to the Second Loan contained a future advances clause, in that, the collateral securing the Second Loan also secured any future advances to be made by Mutual to the Debtor. Mutual perfected its interest in all collateral by filing is UCC financing statement with the Indiana Secretary of State on September 17, 2008. Payment of the

        Second Loan was also secured by real estate located at 4662 East County Road 1100 North, Eaton, Indiana (the "North Eaton Property"), as evidenced by a Mortgage dated September 12, 2008, and recorded September 24, 2008 in the office of the Recorder of Delaware County, Indiana.

3. On or about January 15, 2010, Mutual loaned $20,000 to the Debtor (the "Third Loan"). Payment of the Third Loan was secured by the Collateral pledged in relation to the First Loan as well as vehicles described as a 1989 International 20' Flatbed, a 2005 Gold Star Gooseneck Trailer, and a 1995 Chevrolet C3500 HD 4 x 4 (the "Vehicles"). The security interest in the 1989 International 20' Flatbed was released by Mutual on December 16, 2009. Certificates of Title for the other two Vehicles show the perfection of Mutual's liens and are in the possession of Mutual. Payment of the Third Loan was further secured by a mortgage on the North Eaton Property.

4. Mutual required updated financial information prior to the Second and Third Loans. To that end, the Debtor completed and gave to Mutual written financial statements on September 8, 2008 and on January 12, 2009. Both financial statements contained the provision that the Debtor was providing the financial statement for the purpose of obtaining credit from Mutual and that the Debtor acknowledged that the representations made in the financial statements would be relied upon by Mutual in its decision to grant such credit. On both financial statements, he listed that he owned a 1994 Komatsu PC 75UU-2 Excavator (denominated as a "PC 75 Excavator" on the September 5, 2008 financial

statement). This excavator had been among the collateral pledged to secure the First, Second and Third Loans. The Debtor valued this particular item at $23,000 in the January 12, 2009 financial statement. Also on the January 12, 2009 financial statement, the Debtor listed the following items which he valued at $251,500:

a PC 220 Komatsu excavator, a John Deere 550GLT dozer, a 1980 International tandem dump truck, a 1999 Ford 6640 tractor mower and miscellaneous tools and equipment, a 1989 International 20' flatbed truck, a 2005 Gold Star 25' tandem gooseneck trailer; a 2002 442 Bobcat excavator; a 2003 T200 Turbo Bobcat skidloader; 2006 Bobcat attachments; a 2000 Isuzu truck; a 1995 Chevrolet 3500 HD flatbed and a wood chipper.

5. The Debtor testified, under oath, in his deposition and has admitted that he sold the 1994 Komatsu PC 75UU-2 excavator for scrap to Joe Doughty, his brother, for $2,000.00, in 2007- at least a year before he furnished the September 5, 2008 financial statement.

6. Pursuant to the terms of the Security Agreements in connection with the First, Second and Third Loans, the Debtor promised and agreed to keep the collateral, including all equipment, in his possession, and to keep it in good condition and repair and not to sell or transfer it without Mutual's prior written consent.

7. On December 16, 2009, the Debtor contacted Mutual and requested that Mutual release its lien upon the certificate of title to the 1989 International 20′ flatbed truck in order to the Debtor to sell the truck. Mutual consented to the sale of the truck and released its lien. Mutual has not consented to the sale of any other

collateral pledged to secured the First, Second or Third Loans (collectively, the "Loans").

8. Because the Debtor obtained Mutual's consent with respect to the sale of the 1989 International Flatbed truck, the Debtor knew that under the terms of the Security Agreements in connection with the Loans, the collateral, including all equipment, was subject to Mutual's perfected security interest and that the equipment could not be sold or transferred without the prior consent of Mutual.

9. Pursuant to the terms of the mortgages, the Debtor promised and agreed to perform all repairs and maintenance necessary to preserve the value of the North Eaton Property as well as to not permit or commit or suffer any stripping of or waste on the North Eaton Property.

10. The Debtor filed his chapter 7 case on September 29, 2010. In his bankruptcy schedules, the Debtor listed $2,500.00 in miscellaneous tools but did not schedule any equipment which had been pledged as collateral on the Loans.

11. On September 21, 2010, eight days prior to filing his voluntary bankruptcy petition, the Debtor informed Mutual that he had moved from the North Eaton Property and provided a change of address. The Debtor further informed Mutual that it could inspect the house located on the North Eaton Property but that there was nothing there and that the equipment had been sold.

12. On September 22, 2010, Trent Bradburn, a commercial loan officer with Mutual who had familiarity with the Debtor and the Loans, inspected the North Eaton Property and confirmed that the house had been stripped of all flooring and floor

coverings, fixtures, furnace and air conditioner, toilets and plumbing fixtures, cabinets and doors and nothing was left within the shell structure just as the Debtor has reported on September 21, 2010.

13. On September 22, 2010, two of the Vehicles – namely, the 2005 Gold Star gooseneck trailer and the 1995 Chevrolet C3500-HD 4X4 truck– were the only items of equipment that remained on the North Eaton Property. The 1995 Chevrolet truck had been stripped of its engine. The Debtor testified, under oath, in his deposition and, by virtue of his failure to respond to Mutual's request for admissions, has been deemed to admit that he removed the engine from the truck and sold the engine and retained the sale proceeds for his own benefit.

14. The Debtor testified, under oath in his deposition on January 20, 2011, that he sold the following collateral that secured the Loans and retained the sale proceeds:

| Item of Equipment Allegedly Sold | Defendant's Estimated Sale Price |
|---|---|
| 1985 PC 220 Komatsu excavator | $18,000.00 |
| 1994 PC75 UU Komatsu excavator | $2,000.00 |
| John Deere 550GLT dozer | $13,000.00 |
| 1980 International tandem dump truck | $2,500.00 |
| 1999 Ford 6640 tractor | $5,000.00 |

| | |
|---|---|
| miscellaneous tools and equipment | does not recall |
| 2002 442 Bobcat excavator | $8,000.00 |
| 2003 T200 Turbo Bobcat skidloader | $2,000.00 |
| 2006 Bobcat attachments | $3,500.00 |
| wood chipper | $1,000.00 |
| 1995 Chevy C3500 HD engine | $15.00-20.00 (scrap) |
| Total Alleged Sale Proceeds | $55,020.00 |

15. Mutual had no knowledge of the Debtor's purported sale of these items until the Debtor called Mutual on September 21, 2010.

16. On January 20, 2011, the Debtor testified, under oath, in his deposition that in 2009 the 2002 442 Bobcat excavator was inoperable and that he sold it for scrap on eBay in late 2009 or early 2010 to an unknown buyer for $8,000.00 and retained the sale proceeds.

17. On Thursday, April 14, 2011, contrary to the Debtor's sworn testimony, the 2002 442 Bobcat excavator was located in Delaware County, Indiana, in operable

condition and in the Debtor's possession and was being used by the Debtor for work he was conducting on property owned by Bronnenberg Farms, Inc., Delaware County, Indiana.

18. On January 20, 2011, the Debtor testified, under oath, in his deposition that the 2003 T200 Turbo Bobcat skidloader was not operable and that he sold it for parts on an unknown date to an unknown person from around Richmond, Indiana, for $2,000.00 and retained the sale proceeds.

19. On Thursday, April 14, 2011, contrary to the Debtor's sworn testimony, the 2003 T200 Turbo Bobcat skidloader was located in Delaware County, Indiana, in operable condition in the Debtor's possession at the residence of Verba Doughty, the Debtor's father.

20. When the 2002 442 Bobcat excavator and the 2003 T200 Turbo Bobcat skidloader were located on April 14, 2011, both were in the Debtor's possession and both were in operational condition in that they were loaded on a truck under their own power, contrary to the Debtor's sworn deposition testimony.

21. The Debtor defaulted on payment of the Second and Third Loans.  Mutual is owed principal, interest and late charges of $252,063.50 to September 29, 2010 on the Second Loan and principal, interest and late charges of $20,907.52 to September 29, 2010 on the Third Loan.

22. Collection of the debts owing by the Debtor to Mutual and the foreclosure of security interests in any recoverable collateral is pending in State court before the Delaware Circuit Court No. 4, Cause No. 18C04-1009-MF-106 subject to stay

under 11 U.S.C. §362 from proceeding in personam to collect the debt owing by Doughty to MutualBank pending determination of this Adversary Proceeding.

### *Conclusions of Law*

1. Mutual alleges that the debts owed to it by the Debtor are nondischargeable under Sections 523(a)(4) and (a)(6). Because the Court finds that the debt is nondischargeable under §523(a)(6), it will not address Mutual's §523(a)(4) claim.

2. Exceptions to discharge under §523 are "to be construed strictly against the creditor and liberally in favor of a debtor." *In re Scarlata*, 979 F.2d 521,524 (7th Cir. 1992; *In re Tsikouris*, 340 B.R. 604, 607-08 (Bankr. N. D. Ind. 2006). A creditor that brings a §523 action seeking a determination of nondischargeability bears the burden of proving all the elements of the statute by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 289-90; 111 S.Ct. 654, 661; 112 L.Ed.2d 755 (1991).

### *Section 523(a)(6)*

3. Section §523(a)(6) excepts from discharge a debt for willful and malicious injury by the debtor to another entity or to the property of another entity. To obtain a determination of nondischargeability under Section 523(a)(6), a creditor must prove: (a) that the Debtor intended to and caused an injury; (b) that the Debtor's actions were willful; and (c) that the Debtor's actions were malicious. *In re Carlson,* 224 B.R. 659, 662 (Bankr. N.D. Ill. 1998); *Scarpello*, 272 B.R. at 704.

4. With respect to the "willful" requirement under this section, mere proof that the act that caused injury was "willful", with nothing more, is insufficient to prove

9

nondischargeability under Section 523(a)(6). Rather, "willful" for purposes of this section means intent to cause injury, not merely the commission of an intentional act that leads to injury, as the United States Supreme Court has held in *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Under this approach, it is not enough for acts to be intentional; the act must be specifically calculated to cause the underlying injury. The *Geiger* court clearly eliminated the possibility that "willful" encompasses negligence or recklessness. ("We hold that debts arising from recklessly or negligently inflicted injuries do not fall within the compass of Section 523(a)(6)" 118 S.Ct. at 978). [1] So, for an "injury" to be "willful" for §523(a)(6) purposes, "the debtor must have intended the consequences of her act." *Scarpello*, 272 B.R. at 704.

5. Admittedly, courts have had problems in applying *Geiger's* "willful" standard in that "*Geiger* seems to have created almost as much consternation as it set out to resolve. In part, this is because the Court never said what 'willful' is; only what it is not – it is not negligence, recklessness or a breach of contract". *ABF, Inc. v. Russell (In re Russell)*, 262 B.R. 449, 453 (Bankr. N. D. Ind. 2001). With respect to collateral conversion cases – which is what we have here – Bankruptcy Judge Grant of the Northern District held that the "true injury" in such cases is that "the creditor's

---

[1] In *Kawaauhau*, the Supreme Court noted that the more "encompassing interpretation" of "willful" which the petitioner urged but which the Court rejected included "a wide range of situations in which an act is intentional, but injury is unintended, i.e. neither desired nor in fact anticipated by the debtor" such as a "knowing breach of contract". 118 S.Ct. at 977. See also, *In re Kraye (Kraye v. Lexington Health Care Center of Chicago Ridge, Inc.)*, 1998 WL 775654 (Bankr. N. D. Ill., November 6, 1998) and cases cited therein. See also, *In re Miller (Miller v. J.D. Abrams Incorporated)* 156 F.3d 598 (5th Cir. 1998) where, after a lengthy analysis of the *Kawaauhua* opinion, the Fifth Circuit Court of Appeals held that "an injury is willful and malicious under Section 523(a)(6) "where there is either an objective substantial certainty of harm or a subjective motive to cause harm". 156 F.3d at 606.

10

collateral was wrongly or improperly disposed of and that the proceeds were used for purposes other than payment of the obligation that the property secured...the question to ask is whether the debtor intended to improperly use the creditor's collateral and/or its proceeds for purposes other than the payment of the debt that property secured. If so, there is an intentional injury". *Id* at 454-55. See also, *Global One Financial, Inc. v. Jennings (In re Jennings)*, 2011 WL 2531103 (Bankr. S. D. Ind. 2011) at *9.

6. "Malicious" for §523(a))(6) purposes means "in conscious disregard of one's duties or without just cause or excuse..." although a debtor does *not* have to act with ill will or specific intent to do harm. *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). Section 523(a)(6) is applied solely to tort causes of action. *In re Calclazier*, 134 B.R. 29, 33 (Bankr. W.D. Okla. 1991).

7. The Debtor concealed the location of collateral in which Mutual held an interest and then lied under oath about what he did with it. When he did sell collateral in which Mutual held an interest, he failed to first obtain Mutual's consent, and later failed to remit the proceeds to Mutual, in accordance with the security agreements executed in connection with the First, Second and Third Loans. The Debtor was well aware that he was required to obtain Mutual's consent to the sale of any collateral in which it held an interest because he knew to contact Mutual about the sale of the 1989 International tractor, which Mutual agreed to. The Debtor engaged in a pattern of concealment and misrepresentation of the identities of persons to whom the Debtor allegedly transferred the collateral. He lied under oath as to the whereabouts and status of the collateral. The Debtor stripped the engine from the 1995 Chevrolet

11

C3500-HD 4X4 truck, and stripped, or failed to secure and protect from stripping, the fixtures from the improvements upon the North Eaton Property, rendering that collateral near-worthless or severely damaged. These actions undertaken by the Debtor were "willful" in that he intended to improperly use Mutual's collateral and its proceeds for purposes other than the payment of the debt owed to Mutual. These actions were "malicious" in that they were taken with conscious disregard of the Debtor's duties with respect to the property interests of Mutual, without just cause or excuse. This culminates in the commission of a willful and malicious injury to property interest of Mutual. The Court concludes, therefore, that the debt owed to Mutual by the Debtor in the aggregate amount of $272,970.69 is nondischargeable under §523(a)(6).

### *Section 523(a)(2)(B)*

8. A debt is nondischargeable under §523(A)(2)(B) if it is for an extension of credit that is obtained by a materially false written statement regarding the debtor's financial condition made with the intent to deceive, upon which the creditor relied. *In re Cohen,* 507 F.3d 610, 613 (7th Cir. 2007); *In re Sheridan*, 57 F. 3d 627, 633 (7th Cir. 1995); *In re Harasymiw*, 895 F.2d 1170, 1172 (7th Cir. 1990).

9. Mutual did not allege nondischargeability under §523(a)(2)(B) in its complaint. However, the Debtor was served request for admissions in which the Debtor failed to respond and thus, the admissions were deemed admitted. Among the admissions deemed admitted was that the Debtor made and signed the September 5, 2008 and January 12, 2009 financial statements. The September 5, 2008 and

January 12, 2009 financial statements noted that the Debtor owned a 1994 Komatsu PC 75UU-2 excavator which the Debtor valued at $23,000. Also among the admissions deemed admitted was that the Debtor sold this item to Joe Doughty for $2,000 in 2007 – at least a year before the September 5, 2008 financial statement was made – without Mutual's consent and kept the proceeds. The Debtor also testified of this 2007 sale under oath in his deposition. The Court believes that the Debtor, had he appeared at the trial, would not have been surprised by this evidence as he was put on notice in the request for admissions of the contents of his 2008 and 2009 financial statements disclosing and valuing an asset that he sold without Mutual's permission in 2007. The Court concludes that Mutual's complaint may be amended to conform to the evidence under Fed. R. Bankr. P. 7015(a) and that it may be treated as if Mutual had pled its §523(a)(2)(B) nondischargeability claim.

10. Trent Bradburn testified at trial that, with each loan renewal, Mutual would obtain new financial information from the Debtor and that he relied on the collateral listed by the Debtor in the 2008 and 2009 financial statements in making the Second and Third Loans.

11. The Court concludes that the Debtor obtained an extension of credit by a materially false written financial statement upon which Mutual relied in extending the credit and that such false statements were made with the intent to deceive, as the Debtor was well aware that he had sold the excavator and that he no longer owned it when he made the representation of ownership on the financial statements. Thus, the

      debt owed to Mutual is nondischargeable under the alternate theory of

      §523(a)(2)(B).

12.     The appropriate judgment entry follows.

# # #

Distribution:
J. Philip Updike, Attorney for the Plaintiff, MutualBank
Jeffery Allen Doughty, Debtor / Defendant
Robert S. Koor, Chapter 7 Trustee